# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 46606

| | |
|---|---|
| STATE OF IDAHO,<br><br>        Plaintiff-Respondent,<br><br>v.<br><br>RYAN ALAN FORBES,<br><br>        Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Filed: September 8, 2020<br><br>Melanie Gagnepain, Clerk<br><br>THIS IS AN UNPUBLISHED<br>OPINION AND SHALL NOT<br>BE CITED AS AUTHORITY |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Lansing L. Haynes, District Judge.

Judgment of conviction for involuntary manslaughter, affirmed.

Eric D. Fredericksen, State Appellate Public Defender; Ben P. McGreevy, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent.

_____

HUSKEY, Chief Judge

Ryan Alan Forbes entered an *Alford*[1] plea to involuntary manslaughter, reserving his right to appeal the district court's orders denying his motion to suppress and motion to dismiss indictment. On appeal, Forbes argues the district court erred in denying his motion to suppress evidence of his incriminating statements because these statements were made in violation of his Fifth Amendment right against compelled self-incrimination. Additionally, Forbes alleges the district court abused its discretion by denying his motion to dismiss the indictment because the State presented illegal evidence to the grand jury. Because Forbes's incriminating statements were voluntary, the district court did not err by denying Forbes's motion to suppress. Further, because Forbes's incriminating statements were properly before the grand jury and because other testimony about which Forbes complained did not have a prejudicial effect upon the grand jury

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

1

proceedings, the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment. Accordingly, the judgment of conviction is affirmed.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Cathryn Mason died of heroin toxicity while using heroin when visiting Forbes. Law enforcement officers interviewed Forbes in the days following Mason's death. Forbes told the officers that he was sleeping when Mason, who was drunk, arrived at his mother's house. He stated that he fell back asleep and, upon waking, found Mason unresponsive. Forbes noticed Mason was no longer breathing and did not have a pulse, so he began cardiopulmonary resuscitation and shouted for someone else in the house to call 911. Forbes told the officers that he knew Mason sometimes used heroin, but he had never seen her use it in his presence.

After Mason's death, Forbes was charged with and pled guilty to unrelated criminal charges and was sentenced to serve a period of retained jurisdiction. While serving his period of retained jurisdiction, Detective Beck called Forbes to ask if Forbes would answer some questions related to Mason's death. Forbes stated that he would not do so without a lawyer, and Beck ended the call.

After successfully completing the period of retained jurisdiction, the district court placed Forbes on probation. Forbes subsequently violated the terms of his probation, and he was arrested and incarcerated for the probation violation allegations. The district court released Forbes from jail on the condition that he attend Good Samaritan Rehabilitation, a faith-based residential substance abuse treatment program. The district court delayed the disposition of Forbes's probation violation in order to review Forbes's performance in the rehabilitation program.

While Forbes was in the treatment program, law enforcement officers wanted Forbes to take a polygraph examination regarding Mason's death. Believing that a condition of Forbes's probation was cooperation with law enforcement, Sergeant McDonald contacted Forbes's probation officer, Clint Blettner, to request help coordinating a polygraph examination of Forbes. McDonald and Blettner exchanged a series of emails discussing both the logistics of, and Forbes's expressed reluctance to participate in, the examination. After speaking with Forbes, who was still in the Good Samaritan Rehabilitation Program, Blettner wrote:

> I spoke with [Forbes] last night at the Altar church and he asked me if he "had" to do it. . . . LOL I told him if I tell him to take a polygraph, that he has to do it since he is on felony probation and we have a polygraph condition. Doesn't seem like he is real eager to get it done though!!!

Meanwhile, Blettner wrote in his case notes that he "instructed" Forbes to take the polygraph examination during the conversation.

On the day of the polygraph examination, Steven Hemming, a facilitator with Forbes's rehabilitation program, drove Forbes to the polygraph examination appointment. Hemming believed Forbes had been ordered by his probation officer to take the polygraph examination and communicated this belief to Forbes. Hemming encouraged Forbes to be honest, explaining the examination was an opportunity from God to be relieved of the burden of Mason's death.

At the polygraph examination, the polygrapher, Ted Pulver, conducted a pretest interview, one of three components of the polygraph examination. During the interview, Forbes discussed the circumstances of Mason's death, including that Forbes had injected Mason with heroin on the evening of her overdose. Pulver asked Forbes if he had considered the potential consequences of Forbes's statements, and Forbes and Pulver engaged in a discussion about Forbes's decision:

Forbes: I kind of feel like legally I could walk in here or choose not to and not incriminate myself and probably see nothing happen, you know. It's been three years. I've already spent 15 months. If they want to see me fry--

Pulver: Right.

Forbes: --they would have probably sent me--

Pulver: Yeah.

Forbes: --to the chambers of whatever. But it was my relationship with God that brought me here.

Pulver: So God told you to confess?

Forbes: Yeah, confess. If we confess our sins, he will be faithful and loyal to deliver us from our sins and cleanse us from all unrighteousness.

When Pulver pressed Forbes on why his story changed from previous interviews with law enforcement, Forbes replied that his faith in God convinced him to be truthful.

Beck called Pulver's office during the pretest interview, and Pulver advised Beck of Forbes's statements concerning Mason's death. Beck then spoke with Forbes over the phone, and Forbes stated that he would be willing to speak with Beck in person. Shortly thereafter, Beck arrived at Pulver's office and picked up Forbes. Pulver never administered the other two parts of the polygraph examination.

During the drive to the police station, Beck told Forbes that he was not under arrest. Once at the station, Beck took Forbes into an interview room where he told Forbes he was shutting the door for privacy and that Forbes was free to leave. Forbes signed an acknowledgement of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and a form waiving his Fifth Amendment rights. At the beginning of the interview, Beck asked Forbes how he was feeling and Forbes replied that he felt relaxed, similar to how he felt going into the polygraph examination appointment. Forbes continued:

> Forbes: So they just told me go to this polygraph test and I kind of prayed about it. Spent some time with some of the mentors there at the program and just looking through the Bible for information, you know. And I just-- everything comes truth, truth, truth, truth, so that's where I came in the first place. I think a different point in my time I would have said, no, I'm not going to go in at all, violate me on my probation if you want to, but I don't care to talk to anybody about anything.
>
> Beck: Yeah.
>
> Forbes: But really just looking at it as I was reading 1 John--are you a church goer? 1 John: 19. It was if we confess our sins, he's faithful and just to forgive us our sins and to cleanse us all from our righteousness, so I just--things like that just kept coming up, coming up, and I had a couple weeks to think about it, so I just--I settled in my heart a while ago that I'd come in. Whatever you asked me, I'd be truthful.

Beck proceeded to interview Forbes about Mason's death and Forbes described the same events he described to Pulver during the polygraph examination pretest interview. Beck asked Forbes why he was telling the truth, and Forbes answered that he believed it was what God wanted of him. Forbes began to cry and told Beck the tears were out of fear of what might happen, the significance of telling the truth, and the strength of his relationship with God. After the interview was complete, Hemming picked Forbes up from the station and drove him back to the rehabilitation center. During the drive, Forbes told Hemming that he had been honest with the police and disclosed that he had injected the heroin into Mason.

Subsequently, the State convened a grand jury seeking an indictment for second degree murder and delivery of heroin for Forbes's involvement in Mason's death. The grand jury heard from several witnesses, including testimony from Beck and Pulver describing Forbes's statements that he had injected Mason with heroin. The State also presented testimony from Blettner who described his conversation with Forbes about the polygraph examination as nonchalant and, although he acknowledged that he told Forbes about the polygraph examination,

4

he did not convey that it was mandatory. Cindy Carmack, Mason's mother, testified that she was not aware of any signs that Mason used drugs prior to her overdose. The grand jury returned an indictment against Forbes for second degree murder and delivery of heroin.

Forbes filed a motion to suppress all evidence gathered by police and any statements made by Forbes during and after his pretest polygraph interview with Pulver. Forbes argued, in part, that the circumstances surrounding his disclosures to Pulver violated his Fifth Amendment right against self-incrimination because he was ordered to participate in a polygraph examination or face revocation of his probation. At the hearing on the motion, Blettner testified that although his case notes indicate that he "instructed" Forbes to take a polygraph examination, this only meant that he "informed" Forbes about the polygraph examination. Blettner stated that he "[d]idn't order [Forbes] to do [the polygraph examination] or anything like that. It was just, Hey, this is what is going to happen." Further, Blettner testified that he never threatened Forbes with a probation violation if he refused to take the polygraph and stated it was never his intention to have Forbes's probation violated with respect to any polygraph refusal. However, Blettner stated "it was my fear for Mr. Forbes that he would possibly in the future, you know, there will be violation proceedings initiated by either the judge or the prosecutor because that he had failed to show up." The district court denied Forbes's motion to suppress.

Forbes also filed a motion to dismiss the indictment, alleging, in part, that the State presented illegal evidence to the grand jury when it presented Beck and Pulver's testimony about Forbes's incriminating statements and Carmack's testimony that she did not know Mason to use drugs. At the hearing on the motion, law enforcement officers testified that Mason's vehicle contained syringes and heroin, her room contained drug paraphernalia, her cellular phone contained messages indicating she had used heroin before she met Forbes, and this information had been conveyed to Carmack before her grand jury testimony. The district court denied Forbes's motion to dismiss.

Forbes entered an *Alford* guilty plea to a reduced charge of involuntary manslaughter, but reserved his right to appeal the district court's denials of his motion to suppress and motion to dismiss the indictment. The district court sentenced Forbes to a unified sentence of ten years, with five years determinate. Forbes timely appeals.

5

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

The decision to grant or deny a motion to dismiss an indictment based on irregularities in grand jury proceedings is reviewed for an abuse of discretion. *State v. Marsalis*, 151 Idaho 872, 875, 264 P.3d 979, 982 (Ct. App. 2011). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

## III.

## ANALYSIS

On appeal, Forbes argues the district court erred in denying his motion to suppress the evidence of his incriminating statements because the statements were compelled in violation of his Fifth Amendment right against self-incrimination. Additionally, Forbes alleges the district court abused its discretion by denying his motion to dismiss the indictment because the State presented illegal evidence to the grand jury related to: (1) the incriminating statements Forbes made to Pulver and Beck; and (2) Carmack's testimony related to Mason's prior drug use. The State contends Forbes's incriminating statements were not compelled; thus the district court did not err in denying Forbes's motion to suppress. The State also argues the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment because the State did not present illegal and prejudicial evidence to the grand jury.

6

**A.      The District Court Did Not Err by Denying Forbes's Motion to Suppress**

Forbes argues his incriminating statements made to Pulver during the pretest interview and to Beck during the subsequent interview at the police station were made in violation of his Fifth Amendment right against compelled self-incrimination.  Forbes acknowledges that he did not affirmatively assert his Fifth Amendment privilege against self-incrimination.  As noted, Forbes also waived his Fifth Amendment privilege prior to his conversation with Beck.  Nonetheless, Forbes argues the State created a "classic penalty situation" because Forbes faced the threat of his probation being revoked if he refused to participate in the polygraph examination.  Forbes asserts this threat effectively foreclosed his right to remain silent and coerced him into providing incriminatory testimony.  In response, the State argues that it did not impose a classic penalty situation upon Forbes because it neither explicitly, nor implicitly, threatened to impose sanctions if Forbes asserted his Fifth Amendment right and refused to participate in the polygraph examination.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."[2]  This provision allows a person to refuse to testify against himself at a criminal trial in which he is a defendant.  *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  But, it "also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  *Id.*  These protections do not disappear because an individual is convicted of a crime, imprisoned, or on probation at the time he is compelled to make incriminating statements.  *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).  Thus, whether an individual is already subject to the corrections system or not, if he is compelled to answer questions that may incriminate him without a sufficient grant of immunity, his answers are not admissible against him in a later criminal prosecution.  *Id.*

Because the Fifth Amendment protects against compelled self-incrimination, it does not preclude an individual from voluntarily answering questions in matters that may have criminal consequences.  *State v. Komen*, 160 Idaho 534, 539, 376 P.3d 738, 743 (2016).  Therefore, "a witness confronted with questions that the government should reasonably expect to elicit

---

[2]      The Supreme Court of the United States has held the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.  *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Murphy*, 465 U.S. at 429; *see also Garner v. United States*, 424 U.S. 648, 654 (1976) ("If a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself."). Ordinarily, if the witness chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so. *Murphy*, 465 U.S. at 429.

However, the requirement that the individual must assert the privilege against self-incrimination to claim its protections is inapplicable when the assertion of the privilege is penalized in such a way that it denies the individual a free choice to admit, to deny, or to refuse to answer the questions. *Id.*; *see also Garner*, 424 U.S. at 661. In these cases, sometimes referred to as classic penalty situations, any penalty for asserting the right to remain silent that was likely to compel an incriminating statement violates the Fifth Amendment. *Komen*, 160 Idaho at 540, 376 P.3d at 744. "To constitute a penalty situation, the individual must be faced with the government's assertion, either expressly or impliedly, that invocation of the Fifth Amendment will lead to a substantial penalty." *State v. Powell*, 161 Idaho 774, 778, 391 P.3d 659, 663 (Ct. App. 2017). Thus, in the context of probation, a state may create a classic penalty situation if it explicitly or implicitly asserts that a probationer's invocation of the privilege against self-incrimination would lead to the revocation of the individual's probation. *Murphy*, 465 U.S. at 435. The defendant's belief in the threat of the revocation of probation must be reasonable. *See id.* at 437.

In *Murphy*, the Supreme Court of the United States addressed whether the condition of Murphy's probation that required him to be truthful with his probation officer "in all matters" or face the possibility of the revocation of his probation required Murphy to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. *Murphy*, 465 U.S at 422, 436. During Murphy's participation in a sexual offender treatment program, required as one of the conditions of his probation, Murphy admitted to an unrelated rape and murder. *Id.* at 423. The program counselor informed Murphy's probation officer of the admission. *Id.* The probation officer scheduled a meeting with Murphy, and the officer decided she would report any incriminating statements to the police. *Id.* During the meeting, Murphy

admitted that he had committed a previous rape and murder, and subsequently Murphy was charged with first degree murder. *Id.* at 424-25.

Murphy sought to suppress testimony concerning his confession on the grounds it was obtained in violation of the Fifth and Fourteenth Amendments. *Id.* Murphy argued, in part, that because he was threatened with revocation of his probation if he was untruthful with his probation officer, he was compelled to make incriminating disclosures instead of claiming the privilege. *Id.* at 434. The Court found this claim unpersuasive because there was no reasonable basis for Murphy to conclude the State attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination under either a subjective or objective test. *Id.* at 434, 437. There was no direct evidence that Murphy confessed because he feared his probation would be revoked if he remained silent--he was not expressly informed during the meeting that an assertion of the privilege would result in the imposition of a penalty. *Id.* at 437-38.

Further, if Murphy did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, the Court held that belief would not be reasonable. *Id.* at 438. First, the Court emphasized the long line of decisions prohibiting penalties for the exercise of Fifth Amendment rights, holding "[o]ur decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* Second, the Court underscored that even with a probation violation, revocation of probation is not automatic because Minnesota's probation revocation statute affords a probationer a hearing prior to any revocation. *Id.* Accordingly, the Court held Murphy was not deterred from claiming the privilege by a reasonably perceived threat of revocation. *Id.* at 439.

Similarly, here, we cannot conclude Forbes has shown that his decision to incriminate himself was compelled by an implicit or explicit threat of revocation of his probation. The district court stated in its order denying Forbes's motion to suppress:

> This Court, after observing the witnesses who have testified, and making determinations about credibility, especially with respect to Probation Officer Blettner, finds that the State did not compel Defendant to make any statements to Pulver/Beck. Notwithstanding some inconsistency in language used by Blettner, this Court finds that he did no more than arrange for the polygraph at the request of law enforcement, arrange for Defendant to get a ride to that appointment, and then accurately answer Defendant's questions about the polygraph. He did not

order Defendant to submit to the polygraph, nor did he threaten him with a sanction if Defendant refused.

Although conflicting evidence was presented during the suppression hearing about whether the polygraph examination was mandatory, there was no evidence that the State explicitly or implicitly conveyed to Forbes that he would be subject to the revocation of probation if he invoked his privilege against self-incrimination. Blettner testified he neither conveyed that the examination was mandatory nor threatened Forbes with a probation violation if he refused to participate during his in-person discussion with Forbes about the polygraph examination. In grand jury testimony admitted as evidence during the suppression hearing, Blettner described the conversation as "nonchalant." Further, Blettner testified at the suppression hearing that it was never his intention to report a probation violation with respect to any refusal by Forbes to participate in the polygraph examination. The district court found Blettner's testimony credible and this credibility determination influenced its finding that the State had not threatened Forbes with revocation of his probation if he asserted his Fifth Amendment right against self-incrimination during the polygraph examination. Because the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court, it is not this Court's role to reassess the credibility of the witnesses or reweigh the evidence. Based on the testimony of Blettner, substantial and competent evidence supported the district court's finding that the State did not compel Forbes to forgo his Fifth Amendment right by mandating Forbes's participation in the polygraph examination[3] or by threatening him with a sanction if he invoked his privilege against self-incrimination.

Further, there is no evidence that Forbes confessed because he subjectively feared that his probation would be revoked if he remained silent. Instead, the district court found that Forbes

---

[3]     Even if the district court found that Forbes's participation in the polygraph examination was mandatory, this fact would likely not have created a classic penalty situation absent an express or implicit threat of a probation revocation. In *Murphy*, the Supreme Court of the United States found that a probation requirement that Murphy visit and be honest with his probation officer was insufficient to find compulsion by the State because "the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). Thus, the State does not create a classic penalty situation unless the polygraph examination was mandatory *and* the State either explicitly or implicitly threatened the revocation of probation if the probationer asserted the right against self-incrimination in response to the examination.

followed a moral decision to unburden himself of the story surrounding the circumstances of Mason's death. This finding is supported by substantial and competent evidence.

Forbes invoked his privilege against self-incrimination when Beck initially attempted to speak to Forbes about Mason's death while Forbes was serving his period of retained jurisdiction. However, by the time Forbes attended the pretest interview with Pulver, Forbes's outlook on life had changed. As a result, Forbes did not remain silent when asked questions during the pretest interview with Pulver but instead, provided incriminatory answers. Forbes acknowledged the incriminating nature of his answers and that he could decline to answer questions: "I kind of feel like legally I could walk in here or choose not to and not incriminate myself and probably see nothing happen, you know." Despite understanding his Fifth Amendment right and notwithstanding his previous invocation of that right, Forbes stated that he wished to confess, not because of the possibility of his probation being revoked, but because of his faith in God and his desire to be spiritually cleansed from his sins. Forbes acknowledged that even the possibility of incurring negative legal consequences did not dissuade him from answering the questions, despite refusing to do so in the past:

> [W]hat's different this time is that no matter what happens, you send in that report to the police station, whatever they do with it, it goes to jury system, I get charged with who knows what.
>
> . . . .
>
> You know, whatever happens, I know that [God will] put me where I need to be, so it's faith. It's different this time.

Forbes repeated this sentiment during his interview with Beck. After making incriminatory statements to Beck, Forbes specified that he answered Beck's questions "[b]ecause honestly I think that's what God wants for me. He wants the truth. I think that if I tell the truth and I live by his commandments, that he'll take care of me 100 percent and put me where I need to be." Given these facts, the district court's finding that Forbes made the decision to offer incriminatory statements out of moral and spiritual convictions, not fear of a probation revocation, is supported by substantial and competent evidence.

Because the polygraph examination was not mandatory and there was neither an implicit nor an explicit threat of probation revocation if Forbes invoked his Fifth Amendment privilege in response to the polygraph examination, Forbes was not faced with a classic penalty situation. In the absence of a classic penalty situation, Forbes was required to invoke his privilege against

self-incrimination in order to obtain the Fifth Amendment's protection. Because Forbes did not offer such an invocation and instead voluntarily offered incriminating answers, he cannot now claim the privilege's protections. Accordingly, the district court did not err by denying Forbes's motion to suppress.[4]

## B.    The District Court Did Not Abuse Its Discretion by Denying Forbes's Motion to Dismiss the Indictment

Forbes argues the district court abused its discretion when it denied his motion to dismiss the indictment. Forbes does not argue that there was insufficient evidence to support the grand jury's findings. Instead, Forbes alleges the prosecutor submitted illegal evidence to the grand jury; first by submitting the incriminating statements Forbes made to Pulver and Beck; and second by submitting Carmack's testimony concerning Mason's lack of drug use prior to her overdose. In response, the State contends that the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment.

A collection of statutes and rules govern Idaho grand jury proceedings. Idaho Code § 19-1107 states, "[t]he grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury." The grand jury can receive "any evidence that is given by witnesses produced and sworn before them except as hereinafter provided, furnished by legal documentary evidence, the deposition of a witness in the cases provided by this code or legally admissible hearsay." I.C. § 19-1105.

Idaho Criminal Rule 6.5(a) discusses the quantum of evidence required to warrant an indictment:

> If the grand jury finds, after evidence has been presented to it, that an offense has been committed and that there is probable cause to believe that the accused committed it, the jury ought to find an indictment. Probable cause exists when the grand jury has before it evidence that would lead a reasonable person to believe an offense has been committed and that the accused party has probably committed the offense.

When conducting a review of the propriety of the grand jury proceeding, our inquiry is two-fold. *State v. Martinez*, 125 Idaho 445, 448, 872 P.2d 708, 711 (1994). First, we must determine whether, independent of any inadmissible evidence, the grand jury received legally

---

[4]    As noted, the *Murphy* court also relied on the fact that the probation system Murphy was subject to did not provide for automatic revocation upon a probation violation, but afforded a probationer a hearing prior to any revocation. The same is true under Idaho's probation system.

12

sufficient evidence to support a finding of probable cause. *Id.* In making this determination, every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment. *State v. Brandstetter*, 127 Idaho 885, 887, 908 P.2d 578, 580 (Ct. App. 1995).

Second, even if such legally sufficient evidence was presented, the indictment must be dismissed if prosecutorial misconduct in submitting illegal evidence was so egregious as to have a prejudicial effect on the proceedings. *Martinez*, 125 Idaho at 448, 872 P.2d at 711. "Prejudicial effect" means "the defendant would not have been indicted but for the misconduct." *Id.* Absent a showing of prejudice by the defendant, we will not second guess the grand jury. *Id.* at 448-49, 872 P.2d at 711-12. To determine whether misconduct is so grievous as to be prejudicial and thus to require dismissal, an appellate court must balance the gravity and seriousness of the misconduct against the extent of the evidence supporting the indictment. *Id.* at 449, 872 P.2d at 712.

### 1. Presentation of Forbes's incriminating statements to the grand jury

Forbes alleges the State committed prosecutorial misconduct by presenting the incriminating statements he made to Pulver and Beck to the grand jury and therefore the district court erred in denying his motion to dismiss the indictment. As discussed above, because Forbes did not invoke the privilege against self-incrimination, he cannot now assert that he was denied the protection of the Fifth Amendment. Thus, because Forbes's incriminating statements did not constitute illegal evidence, the State did not commit misconduct, and the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment on this basis.

### 2. Presentation of Carmack's testimony concerning Mason's prior drug use to the grand jury

Forbes alleges the State committed prosecutorial misconduct by presenting Carmack's false testimony about Mason's lack of prior drug use to the grand jury. Forbes contends that by the time Carmack testified in front of the grand jury, she knew Mason had been involved in illegal drug use prior to her overdose, but testified that Mason did not use illegal drugs. Forbes argues that Carmack's testimony was false and so prejudicial that he would have not been indicted but for the presentation of this evidence. Therefore, Forbes alleges the district court abused its discretion by denying his motion to dismiss the indictment on this ground.

The district court found that while Carmack's testimony "clearly implied her belief that Mason was not a prior drug user, despite the fact that other evidence establishes that Carmack knew otherwise," the testimony was immaterial to the outcome of the grand jury proceedings.

13

The district court found the State did not present evidence that Mason died because she was new to drug use, only that she died of heroin toxicity. Further, two law enforcement officers testified during the proceedings that Forbes told them that he believed Mason to be a heroin user. Therefore, the district court found "it is entirely immaterial whether Mason was a prior drug user. The grand jurors heard evidence that she was, and her mother's implied belief that she was not. Neither inference matters."

The district court did not abuse its discretion by finding Carmack's testimony, while potentially misleading, to be immaterial to the proceedings. First, the grand jury was not asked to determine whether Mason was a previous drug user in order to return an indictment for second degree murder. Count 1 of the indictment for second degree murder alleges that Forbes "on or about the 16th day of May, 2014, in Kootenai County, Idaho, did willfully, unlawfully, and with malice aforethought, but without premeditation, kill and murder Cathryn Mason, a human being, by injecting her with heroin, from which she died." Throughout the proceeding, the grand jury heard testimony to support this charge, including the date and location of Mason's overdose and death, that Mason's death was caused by heroin toxicity, and that Forbes's disclosed to Pulver and Beck that he injected Mason with heroin. This evidence was sufficient to support the indictment.

Additionally, the evidence in the record does not indicate that Carmack's testimony had a prejudicial effect upon the proceedings. The grand jury heard evidence that Mason previously engaged in drug use; Forbes expressed that Mason was an opioid user; and they had previously used heroin together. The medical examiner testified that although he did not find injection marks indicating that Mason had been injecting drugs over a period of time, he noted that the needles were tiny and previous injection sites could have been obscured by the injection of intravenous fluids at the hospital. Additionally, the medical examiner testified that lack of insertion marks alone was not indicative of lack of previous drug use as heroin may also be smoked or ingested orally. Finally, he testified that Mason died because of the effects of heroin toxicity. He did not testify that Mason's death was related to being a new drug user. In light of the evidence presented, the district court did not abuse its discretion by finding that Carmack's testimony did not have a prejudicial effect on the proceedings. Accordingly, the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment on this basis.

14

## IV.

## CONCLUSION

The State did not compel Forbes to forgo his Fifth Amendment right against self-incrimination. Because Forbes did not invoke his privilege against self-incrimination, he cannot now invoke its protections. Consequently, the district court did not err in denying Forbes's motion to suppress. Further, the district court did not err in denying Forbes's motion to dismiss the grand jury indictment because Forbes's incriminating statements were properly before the grand jury for consideration and Carmack's testimony did not have a prejudicial effect upon the proceedings. Accordingly, the district court did not abuse its discretion by denying Forbes's motion to dismiss the indictment. The judgment of conviction is affirmed.

Judge GRATTON and Judge BRAILSFORD **CONCUR**.